IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 17, 2007

Charles R. Fulbruge III
Clerk

No. 06-51237

UNITED STATES OF AMERICA

Plaintiff - Appellee - Cross-Appellant

v.

MOHAMMAD H. GHARBI

Defendant - Appellant - Cross-Appellee

Appeals from the United States District Court
for the Western District of Texas

Before JONES, Chief Judge, and DeMOSS and STEWART, Circuit Judges.

EDITH H. JONES, Chief Judge:

Mohammad Gharbi appeals his conviction of conspiracy and fraud, arguing he was deprived of his Sixth Amendment right to choice of counsel. The Government, in turn, cross-appeals the district court's sentencing decision not to enhance Gharbi's offense level for deriving more than $1 million in "gross receipts" as a result of his fraud. We affirm the conviction, vacate the sentence, and remand for re-sentencing.

BACKGROUND

Mohammad Gharbi is one of twenty defendants who were involved in a large-scale conspiracy to defraud various lenders by obtaining residential real estate loans by means of materially false statements. The conspiracy included,

among others, real estate agents, loan processors, appraisers, "straw" buyers and sellers, real estate brokers, and an attorney. The conspirators' typical practice was to purchase a property, obtain a falsely inflated appraisal, and then re-sell, or "flip," the property and pocket the profit. Gharbi, who was a real estate agent in the Austin area, bought and sold properties as part of the conspiracy.

Gharbi's primary trial counsel was David Reynolds. On the morning of trial, Reynolds informed the district court that he needed assistance in trying the case, and sought to enlist Steve Brittain as co-counsel. The Government objected to this arrangement, arguing that Brittain had a conflict of interest because he also represented Gharbi's daughter, Maryam Gharbi ("Maryam"), who was a co-defendant and potential witness in Gharbi's case. Brittain had represented Maryam in negotiating a plea bargain under which she agreed to testify against her father if called by the Government. At the time of the trial, the district judge had not yet accepted Maryam's guilty plea.

Reynolds explained that he and Brittain had erected a "Chinese Wall" between them, and that Brittain would not share any confidential information received from Maryam. Reynolds also stated that Brittain would not cross-examine Maryam in the event she appeared as a witness at trial. Both Gharbi and Maryam testified that they understood and waived any potential conflicts. Nonetheless, the district court found the conflict of interest to be unwaivable, and denied Reynolds's request to associate Brittain as co-counsel.

After a five-day trial, a jury convicted Gharbi on one count of conspiracy to commit mail fraud (18 U.S.C. § 1349); two counts of mail fraud (18 U.S.C. § 1341); one count of wire fraud (18 U.S.C. § 1343); and one count of bank fraud (18 U.S.C. § 1344). At sentencing, the Presentencing Report ("PSR") and Addendum described how Gharbi fraudulently obtained over $1 million in loans, and recommended Gharbi's offense level be enhanced to a minimum of 24 under the United States Sentencing Guidelines § 2B1.1(13)(A). The Government

argued in support of this enhancement, but Gharbi objected, contending he should not be charged with loan amounts that were used to retire pre-existing liens on the subject properties. The district court agreed Gharbi should not be charged with loan amounts that went to pay these "legitimate" debts, and declined to apply the § 2B1.1(13)(A) enhancement. Gharbi's offense level was set at 15, with an advisory range of 18 to 24 months' imprisonment. The district court then sentenced Gharbi below the advisory range, to a prison term of 12 months and one day, five years' supervised release, restitution in the amount of $84,914, and a $500 special assessment.

This appeal and cross-appeal followed. Gharbi argues he was deprived of his Sixth Amendment right to choice of counsel and is entitled to a new trial. The Government argues the district court misinterpreted § 2B1.1(13)(A) of the Guidelines, and maintains Gharbi's offense level should have been enhanced under this provision.

DISCUSSION

I.    Gharbi's Sixth Amendment Claim

Gharbi contends the district court violated his Sixth Amendment right to choice of counsel by denying Reynolds's request to associate Brittain. The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI; United States v. Morrison, 449 U.S. 361, 364 (1981). Part of this guarantee is a criminal defendant's right to retain the attorney of his choice. Powell v. Alabama, 287 U.S. 45, 53 (1932). The right to counsel of choice, however, is not absolute. Rather, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." See Wheat v. United States, 486 U.S. 153, 159 (1988). Thus, there is a presumption in favor of a defendant's counsel of choice,

but that presumption may be overcome by an actual conflict of interest, or by a showing of a serious potential for conflict. Id. at 164. This is true even when a defendant expresses a desire to waive the potential conflict. Id.; United States v. Sotelo, 97 F.3d 782, 791 (5th Cir. 1996).

A valid waiver does not end the inquiry because the district court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160. If a court justifiably finds an actual conflict of interest, "there can be no doubt that it may decline a proffer of waiver." Id. at 162. Because "the likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict," we afford the district court substantial latitude in refusing a waiver where a potential conflict may or may not develop into an actual conflict at trial. Id. at 162-63. We will not reverse a district court's disqualification of counsel for conflict unless the defendant can show the district court abused its substantial discretion in this area. Sotelo, 97 F.3d at 791.

Here we find no abuse of discretion. The district court began with the presumption that Gharbi was entitled to counsel of his choice. Nonetheless, the court found, for a number of reasons, that the presumption was overruled by an irreconcilable conflict of interest. The court noted that Maryam might well be called to testify against her father. If she were called, the court found it "impossible to guess whether [Gharbi's combined] defense team would pull punches" on cross-examination, thereby providing ineffective assistance to Gharbi. The district court also recognized the opposite risk, that Gharbi's counsel could "attack" Maryam Gharbi "with great detail" and thereby jeopardize her plea agreement. Compounding these difficulties was the close family relationship between Gharbi and his daughter, which the court found could create "pressure either real or perceived" on the direction of Maryam's

4

testimony. These factors presented a serious potential for conflict that, in the district court's judgment, could not be resolved by Reynolds's proposed arrangements. In order to protect the rights of all parties and preserve the appearance of fairness, the district court held that Gharbi and Maryam needed separate and independent counsel.

This decision was well within the bounds established by Wheat and is consistent with our precedent. In United States v. Izydore, this court affirmed that a court may deny a request to associate co-counsel based on the serious potential for a conflict of interest. 167 F.3d 213, 221 (5th Cir. 1999). Likewise, in United States v. Millsaps, we affirmed the district court's decision to disqualify a defense attorney who had previously served as counsel for a government witness, citing the potential for "divided loyalties." 157 F.3d 989, 996 (5th. Cir. 1998). The authorities Gharbi cites are distinguishable,[1] and, in any event, show only that "other district courts might have reached differing or opposite conclusions" if faced with somewhat similar facts. See Wheat, 486 U.S. at 164. This is insufficient to show an abuse of discretion.

## II.    Sentencing Appeal

In its cross-appeal, the Government contests the district court's decision not to enhance Gharbi's offense level under U.S.S.G. § 2B1.1(13)(A). We review the district court's findings of fact for clear error and its interpretation and

---

[1] Gharbi relies on two district court opinions from other circuits: United States v. White Buck Coal Co., No. 2:06-00114, 2007 WL 130322, at *13 (S.D. W. Va. Jan. 16, 2007) (finding no conflict, based on an express determination that no confidences remained between counsel and his former client), and United States v. Amuso, 10 F. Supp. 2d 227 (E.D.N.Y. 1998) (finding, in hindsight, that no actual conflict of interest occurred at trial). Gharbi also cites a pre-Wheat decision from the Eighth Circuit for the proposition that a district court should act so as to "alleviate the effects of the conflict while interfering the least with defendant's choice of counsel." United States v. Agosto, 675 F.2d 965, 970 (8th Cir. 1982). There is no such rule in the Fifth Circuit, and in any event, Agosto is inapplicable here because the district court expressly found that Reynolds's proffered solution would not have alleviated the conflict. Gharbi has not shown this finding to be an abuse of discretion.

application of the Guidelines de novo. United States v. Sanchez, 484 F.3d 803, 810 (5th Cir. 2007).

Courts interpreting the Guidelines must begin with the text of the provision at issue and the plain meaning of the words in the text. United States v. Wise, 447 F.3d 440, 446 (5th Cir. 2006). Here, the text provides that a defendant's offense level shall be enhanced by two levels, with the total offense level not to be lower than 24, if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(13)(A), (D). The accompanying commentary defines "gross receipts" as "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G. § 2B1.1(13)(A) cmt. n.11(B).

Here, the question is how properly to calculate the "gross receipts" Gharbi derived from eight residential real estate transactions.[2] Generally speaking, the Government argues Gharbi should be charged with the face amount of the various loans he obtained by fraud, yielding a total derived in excess of $1 million. In response, Gharbi argues that "gross receipts" should not include loan proceeds that were used to pay off the pre-existing mortgages on some of these properties.[3] The district court agreed with Gharbi and excluded such funds because they went to pay "otherwise legitimate" debts. The court below accepted

---

[2] As detailed in the PSR and Addendum, and at sentencing, Gharbi fraudulently obtained loan proceeds from the sale of the properties at 7200 Waterline, 501 Demarett #10, 509 Demarett #14, 511 Demarett #15, 515 Demarett #17, and 12917 Meehan. He also fraudulently obtained loan proceeds for the purchase of the properties at 7200 Waterline and 806½ 13th Street.

[3] This is the only argument Gharbi has raised concerning the proper calculation of his gross receipts. The dissent would reach a different result, but relies on extensive legal and factual arguments that Gharbi chose not to make, either at sentencing or before this court. "We have a general rule in this circuit against addressing arguments that have not been raised either to us or to the district court." Simeon v. T. Smith & Son, Inc., 852 F.2d 1421, 1456 (5th Cir. 1988) (King, J., concurring).

Gharbi's calculation of "gross receipts" in the amount of $715,697, and accordingly did not apply an enhancement under § 2B1.1(13)(A).

Because the interpretation of "gross receipts" and "derived" is a legal question and the relevant facts are uncontested, we begin our analysis with one representative transaction—Gharbi's purchase of the property at 7200 Waterline Drive in the fall of 2001. Both in the briefing and at oral argument the parties spent most of their time on this particular purchase because the questions involved largely dispose of this issue on appeal.

Concerning the Waterline property, Gharbi argues his "gross receipts" were not the full $332,500 he borrowed to fund his purchase, but only the $85,500 left over after paying off the pre-existing mortgage of $247,000. We cannot consider Gharbi's argument as anything other than a request to substitute the words "net receipts" for "gross receipts" in the Guidelines. "Gross" is routinely defined as "an overall total exclusive of deductions." E.g., Webster's Third New International Dictionary 1002 (1976). Here, "gross receipts" means the full amount Gharbi borrowed, before deducting payments for taxes, inspections, commissions, closing costs, and the existing mortgage.[4] Put simply, Gharbi borrowed $332,500 on the Waterline property, and he used the full $332,500 to purchase that property. The transaction, including all of its costs, is of one piece. Had Gharbi borrowed only $85,500 (the amount he contends he "derived"), that smaller loan would not have enabled him to purchase the property. In order to pocket any margin on the back end of his fraud, Gharbi needed to secure a loan large enough to (a) cover the outstanding debt on the property, and (b) clear a profit. To those ends, Gharbi applied for and received a loan for the full $332,500 he needed to complete the purchase from the straw

---

[4] Though Gharbi has not sought the deduction of these other expenses (taxes, commissions, etc.), under his reasoning none of these would count as "gross receipts," because the HUD-1 Settlement Statement directs these funds to be paid to various third parties.

owner.[5] Gharbi's gross receipts consist of the entire amount of that loan, less nothing.

It is unavailing for Gharbi to argue that, because the funds never passed through his hands, he did not "derive" the loan proceeds that were distributed to pay off the previous lienholder. The loan was Gharbi's: he applied for and borrowed the full amount listed. The loan was issued in his name, not in the name of the prior lienholder or any other entity. Portions of that loan were distributed, at Gharbi's direction, to pay various expenses at closing, including the outstanding debt on the property.[6] A defendant derives proceeds under § 2B1.1(13)(A) "where he causes them to be lodged in another with the expectation that he will enjoy the benefits." United States v. Edelkind, 467 F.3d 791, 801 (1st Cir. 2006). Here, Gharbi caused $247,000 to be lodged in the prior lienholder, and he enjoyed a commensurate benefit: the elimination of the previous lien. Without eliminating that lien, Gharbi could not have closed on the sale, and he would not have pocketed an $85,500 profit.

Gharbi attempts to distinguish Edelkind by arguing that he had no "control" or "choice" in the payoff distribution because it was mandatory. In other words, Gharbi was not at liberty to receive the full $332,500 at closing and spend it as he pleased. This argument focuses on the wrong step in the process. When Gharbi applied for the loan, he asked the lender for a sum of money that would enable him to pay the various expenses necessary to clear title to and purchase the Waterline property. The bank accepted that proposal and issued the loan for Gharbi's stated purposes. The entire transaction, from application to closing, was the result of Gharbi's choice and control. Gharbi derived the full

---

[5] Gharbi had earlier "sold" the Waterline property to Matthew Nagy, a straw purchaser, in September 2000. In the fall of 2001, Gharbi "bought" the house back from Nagy.

[6] These various distributions were detailed on the HUD-1 Settlement Statement, which Gharbi certified was a "true and accurate s[t]atement of all receipts and disbursements made on my account or by me in this transaction."

amount of the loan he sought, notwithstanding his contractual obligations to the new lender to direct a portion of the funds to extinguish an existing lien.[7]

This is the only conclusion consistent with the plain language of the Guidelines. Furthermore, to hold otherwise would produce inconsistent sentencing results. By way of example, if a defendant fraudulently borrows $50,000 to purchase a car, it is irrelevant under § 2B1.1(13)(A) whether he buys the car new, directing $50,000 to the dealer, or whether he buys the car used, directing $10,000 to the private seller and $40,000 to the initial lienholder. In both cases, the defendant has fraudulently obtained $50,000 and used the money to buy a car. And in both cases, the money obtained by fraud was used to pay "legitimate debts." But under Gharbi's reasoning, the defendant who uses his ill-gotten gain to buy used property receives a $40,000 "discount" on his sentencing enhancement calculations. This is not an acceptable basis for distinction. See United States v. Bennett, 161 F.3d 171, 193 (3d Cir. 1998) ("[I]t is irrelevant how [defendant] spent the money after he obtained it.").

Indeed, if the amounts Gharbi seeks to exclude do not fall within the expansive definition of "all property . . . obtained directly or indirectly," it is difficult to fathom what purpose those words serve. To hold that Gharbi derived only those funds that passed directly through his hands renders the word "indirectly" a nullity. Because Gharbi obtained and used the full loan amounts for his purposes, he has "derived" the face value of the loans under

---

[7] Gharbi's argument here finds no support in the cases he cites: United States v. Weidner, 437 F.3d 1023 (10th Cir. 2006), and United States v. Colton, 231 F.3d 890 (4th Cir. 2000). Both Weidner and Colton involved the division of receipts among co-conspirators. In those cases, each conspirator was charged only with his divided share. Unlike Weidner and Colton, here there was no division of receipts among co-conspirators. Gharbi himself obtained the entire loan, and directed funds to third parties outside the conspiracy. These payments—properly characterized as spending the plunder rather than dividing it—do not reduce a defendant's gross receipts under § 2B1.1(13)(A), as the Weidner court itself recognized. Weidner, 437 F.3d at 1046 (noting the key distinction between payments to third parties and divisions among "participants" in the conspiracy) (quoting U.S.S.G. § 2GB1.1(13)(A) cmt. n.9 (now n.11)).

§ 2B1.1(13)(A).  See United States v. Stolee, 172 F.3d 630, 631 (8th Cir. 1999) (holding that a defendant indirectly derives funds when he causes them to be distributed in a manner that inures to his benefit).

Whether Gharbi fraudulently borrowed money to "buy" a property from a straw seller, or whether he fraudulently obtained a loan for a straw buyer to "purchase" a property from him, the legal result is the same.  Gharbi derived the funds and used them for his purposes.  The Waterline house provides a perfect example.  In September 2000, Gharbi "sold" the Waterline property to Matthew Nagy, though Nagy never occupied the house and Gharbi continued to live there.  Gharbi derived $233,200 in fraudulent loan proceeds from this "sale."  As above, Gharbi then "repurchased" the Waterline property from Nagy in the fall of 2001, borrowing $332,500 to do so.  In both transactions Nagy was a straw, a name on a piece of paper, as detailed in the PSR and conceded by Gharbi at sentencing.  In both cases the loan proceeds inured to Gharbi's benefit, and he is properly charged with the full amounts.

In addition to the sale and repurchase of the Waterline property, there were six other transactions that factored into Gharbi's total gross receipts:  the purchase of the property at 806 ½ 13th Street, and the sale of the properties at 12917 Meehan, 501 Demarrett #10, 509 Demarrett #14, 511 Demarett #15, and 515 Demarrett #17.  We review each of these in turn.

12917 Meeham:  Gharbi concedes that he received a cash distribution of $30,000 in fraudulently-obtained loan proceeds from the "sale" of this property by Maryam Gharbi in November 2001.  As detailed in the PSR, Maryam was a "straw" seller who claims she never knew she owned this property in the first place.

806 ½ 13th Street:  At sentencing the Government provided detailed evidence that Gharbi fraudulently obtained a loan in the amount of $233,100 for the purchase of this property.  Gharbi chose not to contest the Government's

proof on this point, and the calculation he submitted to the district court included this full amount.

Demarrett Properties: Gharbi and his daughter Maryam conspired to commit bank fraud with regard to four properties on Demarrett Drive. Loans were fraudulently obtained in Maryam's name to complete the purchase of these four homes from her father. The Government argued at sentencing that Gharbi derived, as the seller, the full amount of all four loans, totaling $351,500.[8] Gharbi argued, and the district court agreed, that he should be charged only with the sale proceeds disbursed to him, for a total of $185,197. Unlike the Waterline property, here the record is not clear whether Maryam was a real or straw purchaser of the Demarrett properties. If she was a straw, as was Matthew Nagy, then Gharbi derived the full $351,500. If, on the other hand, she and her father divided the proceeds as co-conspirators, then Gharbi's divided share as an individual "participant" may be as small as $185,197. See United States v. Weidner, 437 F.3d 1023, 1046 (10th Cir. 2006); U.S.S.G. § 2B1.1(13)(A) cmt. n.11(A). Ultimately, this question makes no difference to the issue at hand; in either event Gharbi's gross receipts exceed $1 million.

To sum up, Gharbi derived $233,200 on the sale of the Waterline property; $332,500 on his repurchase of the Waterline property; $233,100 on the purchase of the 806 ½ 13th Street property, and $30,000 on the Meehan property, for a sub-total of $828,800. Whether Gharbi derived $185,197 or $351,500 on the Demarrett transactions, his gross receipts exceed $1 million,[9] and the sentencing enhancement from § 2B1.1(13)(A) applies. Because the district court erroneously omitted this enhancement from the offense level, we vacate and remand for resentencing under the appropriate advisory Guidelines range. See United

---

[8] The individual loan amounts are as follows: $85,500 for 501 Demarrett #10; $90,250 for 509 Demarrett #14; $90,250 for 511 Demarrett #15; and $85,500 for 515 Demarrett #17.

[9] Either $1,013,997 or $1,180,300, respectively.

States v. Davis, 478 F.3d 266, 274 (5th Cir. 2007); United States v. Smith, 440 F.3d 704, 706 n.2 (5th Cir. 2006).

## CONCLUSION

The conviction is AFFIRMED. The sentence is VACATED and the case is REMANDED for re-sentencing consistent with this opinion.

DeMOSS, Circuit Judge, concurring in part and dissenting in part:

## I.

I concur fully with the majority's disposition of Gharbi's Sixth Amendment claim. Judge Yeakel did not abuse his discretion in denying Gharbi's request that Brittain serve as his co-counsel.

## II.

Regarding the government's cross-appeal, I concur with the majority's legal conclusion that the district court may not deduct amounts used to pay off pre-existing, legitimate loans from the aggregate "gross receipts." To hold otherwise would substitute the words "net receipts" for "gross receipts." See United States v. Breve, No. 93-03801, 1994 WL 612296, at *1 (5th Cir. Oct. 18, 1994) ("[T]he district court did not commit reversible error in including the full amounts of all funds derived from the fraud as constituting 'gross receipts'—after all, gross is gross!"); see 5TH CIR. R. 47.5.3. However, in my opinion, the majority erred in allocating all of the gross receipts to Gharbi and in instructing the district court to apply the enhancement when calculating the advisory guideline range; therefore, I respectfully dissent.

## III.

As an initial matter, I disagree with the majority's characterization of Nagy and Maryam as "straws," and I disagree with the majority's factual finding that there was no division of gross receipts among co-conspirators.[1] Based on my review of the record, I do not believe that these indicted co-conspirators deserve

---

[1] The term "straw" does not appear anywhere in the language of the gross receipts enhancement or in the guideline commentary interpreting it. According to the government's first witness, Thomas Martin Henry, a "straw" buyer or seller means "a person that was involved in the [fraudulent] transaction . . . for the purposes of hiding something." Trial Tr. (Vol. 3) 40:5-16. Henry testified that Nagy was an interested party who was not involved in an "arms-length transaction" with Gharbi regarding the Waterline property. In my opinion, this was not exculpatory testimony. Contrary to the majority, I cannot close my eyes to Nagy's and Maryam's participation in this scheme.

this mantle of protection—this "straw" status—that the majority has bestowed upon them.

The factual bases for Nagy's and Maryam's plea agreements stipulate that they made materially false or fraudulent statements on HUD-1 settlement statements and loan applications involving the Waterline and Demarett properties. Although the majority dismissively characterizes Nagy as "a straw, a name on a piece of paper," the facts do not support that characterization.

After reviewing the trial transcript, I am convinced that Nagy was not a straw and that the district court should have allocated a certain amount of gross receipts to him. Nagy testified to the following facts at Gharbi's trial: Firooz Deljavan, an indicted co-conspirator who remains a fugitive, recruited Nagy to purchase the Waterline property from Gharbi.[2] Based on representations made by Deljavan, Nagy expected to be paid at least $25,000 in exchange for his participation in the scheme.[3] Nagy executed a power of attorney, which authorized Deljavan to act on Nagy's behalf regarding his purchase of the Waterline property, but this power of attorney was never used.[4] On the same day, Deljavan took Nagy to Gharbi's office, picked up a check for $10,000, cashed it, and gave the money to Nagy.[5] The $10,000 check was drawn on Gharbi's personal account and payable to Deljavan.[6] Nagy never had any discussion with Gharbi concerning the purpose of the $10,000; Deljavan was Nagy's sole source of information regarding the two Waterline transactions.[7]

---

[2] Trial Tr. (Vol. 4) 13:21-25, 14:1-9, 47:15-18.

[3] Id. at 7:16-21.

[4] Id. at 14:5-9, 14:18-23.

[5] Id. at 17:5-7, 17:16-21, 18:17-22, 21:4-9.

[6] Id. at 18:17-22.

[7] Id. at 21:7-17, 34:15-20, 46:3-12.

Nagy understood that the Waterline property would be purchased in his name, and then would either be immediately sold or rented out and sold at a later date.[8] As part of the scheme, Nagy expected that the property titled in his name would eventually be sold and his personal liability on the mortgage would be extinguished from the gross receipts of the final sale.[9] Deljavan mailed the closing documents to Nagy in England, and Nagy executed those documents with the expectation that he would be paid the remaining $15,000 he was promised by Deljavan.[10] At the time he executed the closing documents related to his purchase of the Waterline property, Nagy knew that they were fraudulent.[11] Nagy signed a HUD-1 settlement statement, promissory note, and deed of trust. But for the fraudulent statements contained in these closing documents, Nagy—the borrower—would not have derived $230,802 in gross receipts from Option One Mortgage Corporation, a financial institution.[12] Shortly after Nagy executed the fraudulent closing documents, Deljavan personally met Nagy in England and paid him $15,000 cash.[13] Nagy never made any out-of-pocket payments involving the Waterline property, and he never intended to live in the property.[14] Approximately one year later, Nagy executed another power of attorney, which allowed Deljavan to act as Nagy's agent in Gharbi's purchase of the Waterline property from Nagy.[15] But for his fraudulent statements on the

---

[8] Id. at 16:22-25.

[9] Id. at 47:19-25.

[10] Id. at 23:1-20, 27:1-7.

[11] Id. at 24:1-5, 25:3-8, 28:7-22, 31:5-13, 32:2-5, 32:23-25, 33:6-22.

[12] See Gov't Ex. 2.

[13] Trial Tr. (Vol. 4) 36:1-19.

[14] Id. at 34:21-25, 35:1-10, 36:20-25, 47:2-11.

[15] Id. at 35:11-24.

closing documents, Gharbi—the borrower—would not have derived $332,500 in gross receipts from Guardian Mortgage Services, Inc., a financial institution. From the gross receipts of Gharbi's purchase of the Waterline property from Nagy, $247,000 was used to pay off Nagy's old mortgage, and $87,369 was paid to Deljavan.[16] Gharbi did not pocket any gross receipts from his purchase of the Waterline property from Nagy, but he did pocket a significant sum from Nagy's purchase of the Waterline property from Gharbi.[17]

In my opinion, a person who is a mere straw does not do the following: (1) personally execute a fraudulent HUD-1 settlement statement, promissory note, and deed of trust; (2) receive a front-end advance and a back-end kickback of gross receipts; (3) reap the benefit of gross receipts used to extinguish personal liability on a fraudulently obtained mortgage; (4) confess to substantial participation in the fraud; (5) and then plead guilty to a felony count of wire fraud.[18] Furthermore, a cursory examination of the Waterline transactions indicates that there was a division of gross receipts among co-conspirators: Deljavan received $87,369 in gross receipts from Gharbi's purchase of the Waterline property from Nagy, Nagy's personal liability on a $247,000 mortgage was extinguished with gross receipts from that same purchase, and the $15,000 cash payment made by Deljavan to Nagy is traceable to gross receipts from Nagy's purchase of the Waterline property from Gharbi. Based on these facts, I believe that Nagy derived $230,802 in gross receipts from a financial institution, and this amount should not be attributed to Gharbi.

IV.

---

[16] Deljavan received a $66,369 check payable to "SBR, Inc. or Firooz Deljavan" and a second $21,000 check payable to himself as a "commission." Both of these checks were drawn on the escrow account of attorney Allan Craig, an indicted co-conspirator.

[17] See Gov't Ex. 2, Ex. 4D.

[18] Trial Tr. (Vol. 4) 42:1-8.

In conspiracy cases involving the gross receipts enhancement, the district court must determine at sentencing "if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000." U.S.S.G. § 2B1.1(13)(A) cmt. n.11(A) (emphasis added); see United States v. Kohli, 110 F.3d 1475, 1477 (9th Cir. 1997) ("The sentencing court must determine the amount derived from the offense by each defendant individually. It follows that in making that determination, no part of the amount found to have been derived by one defendant can be counted as having been derived by another defendant.") (internal citation omitted); United States v. Weidner, 437 F.3d 1023, 1046 (10th Cir. 2006) (same); United States v. Castellano, 349 F.3d 483, 486 (7th Cir. 2003) (same). "Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." United States v. Holbrook, 499 F.3d 466, 468 (5th Cir. 2007) (quoting Stinson v. United States, 508 U.S. 36, 38 (1993)).

In my opinion, Judge Yeakel reached the right result—the enhancement does not apply to Gharbi—for the wrong reason—by reducing the aggregate "gross receipts" by the amounts used to pay off pre-existing, legitimate loans. The purpose of this sentencing guideline is to enhance the punishment of the defendant who individually derives more than $1 million in gross receipts from one or more financial institutions as a result of the offense. In my view, the fraudulent conduct in this case is procuring a loan from a lender based on fraudulent statements. The "gross receipts" would be the original principal amount of the loan represented by the promissory note. The person who "derives" such gross receipts is the borrower who executes the loan application and promissory note. Based on the facts of this case, I believe it is reasonable to allocate the face value of the loans as gross receipts attributable to the borrower.

For example, when Nagy purchased the Waterline property from Gharbi, Nagy executed the fraudulent loan application, and he derived gross receipts from Option One Mortgage Corporation in the amount of $230,802. Nagy derived this money from a financial institution as a result of his fraudulent conduct. In my opinion, what happened to the money after Nagy derived it from the financial institution is irrelevant. See Kohli, 110 F.3d at 1477-78 ("[T]he definition of 'gross receipts' encompasses funds controlled by the defendant before he compensates his cohorts."). If we attributed $230,802 in gross receipts to Nagy, then the enhancement would not be applicable to Gharbi if the majority's high-end allocation of $1,180,300 to Gharbi is reduced to $949,498. Similarly, but for the fraudulent statements contained in the four Demarrett loan applications executed by Maryam, she would not have derived an aggregate of $351,500 in gross receipts from several financial institutions. If these gross receipts were attributed to Maryam, then Gharbi's allocation of gross receipts would be further reduced to $597,998.

I agree with the majority's conclusion that the $332,500 loan made to Gharbi for his purchase of the Waterline property from Nagy should be attributed to Gharbi because he was the borrower; however, I disagree with the majority's conclusion that the $230,802 loan made to Nagy for his purchase of the Waterline property from Gharbi should also be attributed to Gharbi. In my opinion, the gross receipts should be attributed to the borrower who knowingly submitted the fraudulent loan application and derived the proceeds from the financial institution. I would affirm the district court's refusal to apply the gross receipts enhancement under our rule that allows us to affirm for any reason supported by the record, even if not relied on by the district court. LLEH, Inc. v. Wichita County, Tex., 289 F.3d 358, 364 (5th Cir. 2002).

V.

I acknowledge that other courts have advocated a "tracing" allocation method, but I do not approve of it. As stated previously, I believe that the gross receipts should be attributed to the borrower who derives funds from a financial institution as a result of the fraudulent statements made on the loan application. In my view, the fraud is consummated once the financial institution distributes the funds to the borrower. In contrast, the "tracing" allocation method allocates gross receipts based on the actual dollar amount that inured to the benefit of each co-conspirator who participated in the scheme. See United States v. Khedr, 343 F.3d 96, 101 (2d Cir. 2003) (reducing gross receipts attributable to the defendant who submitted fraudulent loan applications by the amount that he distributed to his co-conspirator); see also Khohli, 110 F.3d at 1478. I have previously demonstrated that there was a division of receipts among co-conspirators, which is contrary to the position of the majority, and this division would be relevant to the "tracing" allocation method if it were used.

I believe my "borrower" allocation method is sound. However, we have previously held that a district court's allocation of gross receipts among co-conspirators is reviewed for clear error and that we afford the district court wide latitude in making that factual determination. See United States v. Patrick, 88 F. App'x 32, 34 (5th Cir. 2004); see also United States v. Millar, 79 F.3d 338, 346 (2d Cir. 1996) (remanding to the district court for findings on the amount of gross receipts the defendant derived "individually—not jointly—from the offense"). As an alternative to affirming based on my "borrower" allocation method, we should have remanded without instructing the district court to apply the enhancement so that it could allocate gross receipts among the various indicted co-conspirators involved in this scheme.

VI.

On remand, I note that the district court may entertain the possibility of imposing a non-guideline sentence on Gharbi. See United States v. Smith, 440

19

F.3d 704, 707 (5th Cir. 2006) (regarding appellate review of non-guideline sentences); see also Gall v. United States, --- S. Ct. ----, 2007 WL 4292116, *2 (Dec. 10, 2007) ("We now hold that, while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard.").