# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-51142

United States Court of Appeals
Fifth Circuit

**FILED**
April 30, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

ELIZABETH GARCIA DE NIETO,
Also Known as Betty, Also Known as Elizabeth Jurado,

Defendant–Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, GRAVES, and WILLETT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Elizabeth Garcia De Nieto was convicted of conspiracy to defraud the United States, mail fraud, and aiding and abetting aggravated identity theft. De Nieto appeals, challenging the court's calculation of the loss amount, the sufficiency of the evidence to support the verdict that she aided and abetted aggravated identity theft, and the court's disqualification of her original attorney for conflict of interest. We affirm.

No. 16-51142

I.

De Nieto would send packages from her house in Mexico to her contacts in the United States, including numerous completed tax returns that had been preaddressed to the IRS. De Nieto reimbursed her contacts for their expenses in sending the tax returns to the IRS and sometimes also paid them.

The fraudulent returns followed a pattern. Each (1) listed the taxpayer as single or as head of household, (2) reported income from self-employment as a sole proprietor, usually as a nail technician or a barber, (3) claimed three exemptions: the taxpayer and two dependents, who were usually foster children, nieces, or nephews, and (4) claimed a refund of about $5000. Though the names and social security numbers corresponded to real persons, those individuals did not file the returns or authorize De Nieto to file for them. They also did not receive the refunds claimed on the returns because the addresses on the returns were not their real addresses but, instead, were addresses of De Nieto's contacts in the United States, who received the checks.

The contacts would forward the refund checks to De Nieto in Mexico, and she would arrange to have them cashed. When refund checks she expected did not arrive, she called IRS service centers for assistance.

The IRS discovered the scheme by investigating a business cashing a large number of tax refund checks and determining that the refunds were obtained fraudulently. When the IRS visited the addresses that appeared in the returns, it learned about De Nieto from the individuals at those addresses. Consequently, agents began to intercept packages arriving into the United States that had De Nieto's name and return address and contained numerous tax returns that matched De Nieto's pattern. Shortly thereafter, border agents apprehended a man attempting to bring a package of tax returns that matched De Nieto's pattern across the border. The man admitted that he worked for De

2

No. 16-51142

Nieto and that she had provided him with the returns and had instructed him to mail them in the United States.

Agents then called De Nieto, who explained that she was responsible for the tax returns, and told her to retrieve them at a port of entry in El Paso. A woman named Yolanda Turrubiatez Nuñez came to the port of entry claiming to be De Nieto and asking for the tax returns. After agents arrested Turrubiatez, she admitted that she was not De Nieto.

In the presence of her attorney, Kenneth del Valle, Turrubiatez explained that De Nieto had instructed her to impersonate De Nieto and to retrieve the confiscated tax returns. She also stated that she had witnessed De Nieto preparing the seized returns, that De Nieto had given them to the man apprehended trying to bring them into the United States, and that De Nieto had instructed her to mail other returns to the United States. Turrubiatez pleaded guilty of making a false statement in violation of 18 U.S.C. § 1001 for her attempt to impersonate De Nieto.

De Nieto was arrested when she tried to cross from Mexico. After agents informed De Nieto of her rights, she acknowledged that she had prepared the tax returns seized from the man attempting to bring them into the United States. She also admitted that Turrubiatez had attempted to retrieve the returns for her, but she contradicted Turrubiatez's account by claiming that she had not known that Turrubiatez would impersonate her.

A grand jury charged De Nieto in a ten-count indictment. Counts One and Ten charged her with conspiring to defraud the United States in violation of 18 U.S.C. §§ 371 and 286, respectively. Counts Two through Six charged mail fraud in violation of 18 U.S.C. § 1341. Counts Seven through Nine charged aiding and abetting aggravated identity theft in violation of 18 U.S.C. §§ 2 and 1028A.

3

No. 16-51142

Early in the prosecution, Turrubiatez's attorney, del Valle, filed an appearance for De Nieto. Because it was possible that a serious conflict of interest would arise from del Valle's representation of both Turrubiatez and De Nieto, the government moved to disqualify del Valle as De Nieto's attorney. Without holding a hearing or requesting De Nieto's response, the district court granted the motion and appointed new counsel for De Nieto.

II.

At trial, the government presented testimony of De Nieto's contacts in the United States and IRS call center representatives who had spoken with De Nieto when she impersonated taxpayers and called to ask about tax returns. The government also proffered fraudulent returns consistent with De Nieto's pattern, some filed with the IRS and some seized at the border, and refund checks obtained through those fraudulent returns. De Nieto offered no testimony or evidence. The jury found her guilty on all counts.

Based on trial testimony and the IRS's investigation into De Nieto's fraudulent scheme, the presentence investigation report ("PSR") estimated that De Nieto's intended loss exceeded $8.2 million. Determining that the PSR's estimate was reliable, the district court adopted this loss amount, triggering an 18-level increase in De Nieto's offense level. The court sentenced De Nieto to 192 months' imprisonment and $3,009,999.80 in restitution.

De Nieto appealed, and del Valle filed her opening brief. After the government brought to this court's attention del Valle's previous disqualification, the court suspended briefing and ordered a limited remand "so that a record as to the conflict and possibility of waiver c[ould] be better developed." On that remand, the district court held a hearing regarding whether del Valle could represent De Nieto on appeal. The court considered De Nieto's testimony and each party's contentions and determined that del Valle be disqualified from the

No. 16-51142

appeal.  It then appointed new counsel for De Nieto, and this appeal resumed.

On appeal, De Nieto challenges (1) the calculation of the loss amount, (2) the sufficiency of the evidence to support the verdict that she aided and abetted aggravated identity theft, and (3) the disqualification of De Nieto's original attorney for conflict of interest.  She also asserts that (4) even if the court's various errors do not warrant reversal on their own, the judgment should be reversed for cumulative error.

## III.

De Nieto challenges the district court's reliance on the PSR's loss estimate, contending "that the extrapolation of 1,727 fraudulent returns and the extrapolation of an $8,480,425.00 dollars loss are not based on any evidence presented at trial and that the extrapolations are clearly erroneous."  She asserts that "most of the [fraudulent returns] were never linked to [her] at trial yet they were used to estimate the [loss] applicable to her."  She raises "the problem of multiple conspiracies" engaged in the same criminal activity as was she, and consequently her "criminal liability is left unresolved."  De Nieto's contentions are unavailing, and she does not satisfy her burden of demonstrating that the information in the PSR is "inaccurate or materially untrue." *United States v. Danhach*, 815 F.3d 228, 238 (5th Cir. 2016) (citation omitted).

## A.

We review for clear error the factual findings of whether a loss resulted from an offense. *United States v. Bazemore*, 839 F.3d 379, 387 (5th Cir. 2016) (per curiam).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).  But "[t]here is no clear error if the

No. 16-51142

district court's finding is plausible in light of the record as a whole." *United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010) (citation omitted).

Given the district court's "unique position to assess the evidence and estimate the loss" amount, its "loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. 3(C); *see also United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012). Thus, this court gives "wide latitude" to the district court "to determine the amount of loss." *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007). The district "court need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1 cmt. 3(C), based on available information, *Jones*, 475 F.3d at 705. The loss amount "need not be determined with precision," *United States v. Reasor*, 541 F.3d 366, 369 (5th Cir. 2008), nor "absolute certainty," *United States v. Goss*, 549 F.3d 1013, 1019 (5th Cir. 2008). "[I]n making its loss-amount estimate," "[a] district court may rely upon information in the PSR . . . so long as that information bears some indicia of reliability." *Danhach*, 815 F.3d at 238 (internal quotation marks and citation omitted). When a defendant challenges a PSR's loss estimate, "he bears the burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue." *Id.* (cleaned up).

The Sentencing Guidelines state that the loss is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A). An "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. 3(A)(i). An "intended loss" is "the pecuniary harm that the defendant purposely sought to inflict," even if that harm "would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. 3(A)(ii).

B.

The district court utilized the intended loss, which exceeded the actual loss because not all the returns submitted under De Nieto's scheme resulted in

refunds.  To estimate that intended loss, the court relied on the PSR, which connected De Nieto to 1727 fraudulent returns together claiming refunds of more than $8.2 million.  The court found that the PSR contained "sufficiently reliable information" and that it bore "indicia of reliability."

The court did not err in making that reliability determination.  To calculate the estimated intended loss, the PSR analyzed the investigative reports and trial testimony of IRS agents who had investigated De Nieto's scheme, including a chart that summarized their findings.  Examining returns that De Nieto admitted to completing, returns that witnesses identified De Nieto as having completed, and returns from addresses that repeatedly appeared on cashed, fraudulently obtained refund checks where individuals had implicated De Nieto, agents first compiled a list of addresses.  They next gathered the 1727 returns associated with those addresses that claimed a refund.  Those returns followed a similar pattern, (1) listing the taxpayer as single or head of household, (2) reporting income only from self-employment as a sole proprietor using one of three business codes (often for nail salons or barber shops), (3) claiming three exemptions, the taxpayer and two dependents, and (4) claiming a refund through the earned-income tax credit of about $5000.  As the district court noted, these similarities strongly supported the inference that De Nieto was the source of all the returns.  Therefore, in relying on the PSR, which in turn relied on the agents' investigation, the court reasonably determined that De Nieto intended the loss that would have resulted from the 1727 fraudulent returns.

De Nieto attempts to undermine that estimate of loss from numerous angles, none of which satisfies her burden of demonstrating that the information in the PSR is inaccurate or materially untrue.  De Nieto's main theory is that someone else could have been responsible for some of the fraudulent

returns linked to her, such as other individuals involved in a separate conspiracy engaging in the same criminal activity. She supports that contention with trial testimony establishing that other persons also used the technique of submitting fraudulent tax returns with stolen identifies to obtain refunds. Aside, however, from generalized averments to the possibility of another conspiracy, De Nieto does not offer evidence demonstrating that another conspiracy utilized her "signature" pattern for completing the returns. Without "evidence that rebuts the PSR on the loss amount," De Nieto's mere speculation is insufficient to show that the PSR was unreliable or that the district court erred in adopting it. *See Danhach*, 815 F.3d at 238.

Aside from the overriding theory of mistaken attribution, De Nieto's challenge to the loss amount calculation is replete with contentions premised on mistaken understandings of the record or the law. First, she asserts that she cannot be held accountable for fraudulent returns dating back to 2010 because the IRS's investigation did not identify her until 2014. De Nieto ignores the obvious reality that investigations often uncover criminal activity that occurred before the investigation's commencement. Moreover, evidence established that De Nieto had been operating her scheme as early as 2008.

Second, De Nieto protests that the evidence did "not clearly parse out which transactions reflected in the [IRS's summary] chart are attributable to" her. Nevertheless, the district court's estimate of the loss need only be reasonable, and therefore the court properly relied on connections established by De Nieto's pattern of fraudulent returns.

Third, De Nieto derides the IRS's summary chart by characterizing it as incorporating any return investigators deemed "not 'typical.'" That description is plainly incorrect. The IRS gathered the 1727 returns by identifying all returns that fit De Nieto's pattern connected with addresses linked to her.

8

No. 16-51142

Fourth, De Nieto states that searches at some of the addresses the IRS relied on revealed "no evidence of any illegal activity and [had] no connection to" De Nieto. The record refutes this contention. Witnesses interviewed at those addresses implicated De Nieto in the scheme, and investigators learned that the "addresses were being used to collect and receive refund checks" that "were being passed off or forwarded to Ms. De Nieto in . . . Mexico."

Fifth, De Nieto erroneously states that the IRS "assigned a refund of approximately $5,000.00 to each [tax return]" incorporated in the summary chart. The summary chart actually lists the exact amount each return claimed.

Sixth, De Nieto purports to identify contradictions in the trial testimony regarding the loss amount. She misconstrues the testimony. As the PSR reflected, the IRS's investigation connected 1727 fraudulent returns to De Nieto that claimed over $8.2 million in refunds. A subset of those 1727 returns resulted in refund checks that were cashed for more than $2.9 million. A different subset of the 1727 returns came from packages seized by law enforcement with claimed refunds totaling over $1.2 million. Thus, there was no inconsistency in the loss amount testimony.

Seventh, De Nieto attacks the loss amount by asserting that it was based on "supposition" regarding her connection to other groups. Again, the PSR estimated the loss amount by analyzing De Nieto's conduct, not that of other groups, a fact readily apparent from the government's case at sentencing.[1]

Eighth, and finally, De Nieto contends that one of her U.S. contacts did not participate in the scheme long enough to generate an intended loss of over

---

[1] The government stated that "while there are different groups conducting a similar scheme . . . what is before this Court is the four corners of the superseding indictment." It then explained that "what we're dealing with in the superseding indictment is . . . the tax returns that are specifically attributed to Ms. [De Nieto]."

9

No. 16-51142

$8.2 million.  De Nieto selectively ignores the fact that she had multiple contacts in the United States, meaning that the government did not have to establish that a single person generated all of the intended loss.

De Nieto's various contentions are meritless in the face of the record evidence and the law.  She does not proffer evidence that demonstrates that the district court relied on a PSR containing inaccurate or materially untrue information.  The court's loss estimate was reasonable and plausible in light of the record as a whole and thus was not error, let alone clear error.

## IV.

De Nieto maintains that the evidence was insufficient to prove beyond a reasonable doubt that she aided and abetted the aggravated identity theft of the three victims.  De Nieto concedes that some "person(s) . . . committed the identity theft of the . . . three victims" but asserts that the government "failed to prove . . . beyond a reasonable doubt" that she was "associated with the criminal venture that stole and or misused the identity of the three victims." Consequently, "no reasonable trier of fact could conclude that [De Nieto] was guilty of aiding and abetting . . . the identity theft."  To the contrary, viewing the evidence in the light most favorable to the prosecution, making all inferences in the prosecution's favor, and showing high deference to the verdict, a jury rationally could have found that De Nieto took an affirmative act in furtherance of the aggravated identity theft with the intent of facilitating the commission of that offense.

## A.

"[A] defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997). This court "must affirm a conviction if, after viewing the evidence and all

10

reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc) (citation omitted). "Though de novo, this review is nevertheless highly deferential to the verdict." *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017) (internal quotation marks and citation omitted).

A defendant has committed aggravated identity theft when he has "(1) knowingly used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c)." *United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016). Section 1028A(c) includes mail fraud in violation of 18 U.S.C. § 1341. 18 U.S.C. § 1028A(c)(5).

The federal aiding-and-abetting statute extends principal criminal liability to anyone who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense. *Id.* § 2(a). "[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). The statute's purview is broad, "comprehend[ing] all assistance rendered by words, acts, encouragement, support, or presence . . . even if that aid relates to only one (or some) of a crime's phases or elements." *Id.* at 73 (internal quotation marks and citation omitted).

### B.

There is sufficient evidence in the record to support the jury's verdict. First, De Nieto called the IRS using the social security number of one of the victims, J.R., to ask about one of the fraudulent returns. Second, the

11

fraudulent returns using the victims' names and social security numbers matched De Nieto's pattern. Each return listed a filing status of single or head of household, claimed two foster children, nieces, or nephews as dependents, reported self-employment at a nail salon, and claimed a refund of about $5000.

Third, the fraudulent returns included addresses associated with De Nieto. The return submitted using B.C.G.'s information, which formed the basis for Count Seven, used an address that was the home of one of De Nieto's U.S. contacts who received packages containing fraudulent returns from De Nieto and forwarded the refund checks they generated back to De Nieto. Moreover, De Nieto used the address when she called the IRS impersonating a different identity-theft victim. The fraudulent return submitted using E.O.'s information, which formed the basis for Count Eight, used an address that was a business address where one of De Nieto's U.S. contacts opened a post office box to receive tax-related mailings at De Nieto's instruction. Finally, the fraudulent return submitted using J.R.'s information, which formed the basis for Count Nine, used an address that De Nieto claimed as her home address when she was arrested and whose occupant testified that De Nieto sent fraudulent returns there and used that address to receive refund checks.

De Nieto does not seriously contest the connections between this evidence and herself but instead deflects liability to an unspecified "group of persons that stole and misused the three identities." But contrary to her assertion that "there is no direct or circumstantial evidence linking her to the aiding and abetting the theft or misuse of the three specific identifications in question," the evidence detailed above would allow a jury rationally to conclude beyond a reasonable doubt that De Nieto took affirmative acts in furtherance of the aggravated identity theft with the intent of facilitating the commission of the offense.

No. 16-51142

V.

De Nieto asserts that the district court violated her Sixth Amendment right to counsel by disqualifying her original trial court attorney, del Valle, without first holding a hearing. She contends that "[i]n each and every case that has dealt with this issue, the district court has held a hearing to divine the facts to determine whether an actual or perceived conflict of interest exists." De Nieto identifies no abuse of discretion in the disqualification of del Valle, and precedent belies her contention that a court must inevitably hold a hearing in every case. Even assuming that the court abused its discretion by not holding a hearing, that supposed error was harmless.

A.

This court "will not reverse a district court's disqualification of counsel for conflict unless the defendant can show the district court abused its substantial discretion in this area." *United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Fornesa v. Fifth Third Mortg. Co.*, 897 F.3d 624, 627 (5th Cir. 2018) (citation omitted).

"[W]hile the right to . . . be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Therefore, the "right to choose one's own counsel is circumscribed in several important respects." *Id.* For example, "the right to counsel of choice is limited if that counsel has an actual conflict of interest or a serious potential conflict of interest that may arise during trial." *United States v. Jackson*, 805 F.3d 200, 202

13

(5th Cir. 2015). "[W]hile we recognize a presumption that a defendant is entitled to counsel of choice, that presumption may be rebutted by a showing of actual or potential conflicts of interest." *Id.* Whether a party has met its burden to demonstrate these conflicts of interest "must be left primarily to the informed judgment of the trial court." *Wheat*, 486 U.S. at 164.

Defendants may waive conflicts of interest in some situations. *See id.* at 162. Nevertheless, the district court must be ever wary of "the subtle problems implicating the defendant's comprehension of the waiver" to protect "the integrity of the court" and defend against "future attacks over the adequacy of the waiver or the fairness of the proceedings." *Id.* (citation omitted). Even "[a] valid waiver does not end the inquiry because the district court has an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Gharbi*, 510 F.3d at 553 (internal quotation marks and citation omitted). Consequently, given the delicate balancing of a defendant's Sixth Amendment rights with "nascent conflicts of interest [that] are notoriously hard to predict," "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest . . . where an actual conflict may be demonstrated before trial [and] where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 162–63.

## B.

The district court did not abuse its discretion in disqualifying De Nieto's attorney. Del Valle had previously represented Turrubiatez in a related case and thus risked multiple conflicts of interest between his current client, De Nieto, and his former client. He would have faced an intractable conflict between his duty to keep his communications with Turrubiatez confidential,

and his duty to consider appropriate courses of action for De Nieto free from professional and ethical restrictions that would foreclose alternatives that otherwise would have been available to her.[2]

Indeed, De Nieto pleaded not guilty, denied involvement in the fraudulent tax return scheme, and denied that she had instructed Turrubiatez to impersonate her at the border, but Turrubiatez, as part of her guilty plea, had implicated De Nieto in the scheme and had accused De Nieto of instructing her to impersonate De Nieto. Consequently, del Valle, by having represented Turrubiatez and attempting to represent De Nieto, would have been put into the position of admitting either that Turrubiatez had lied to the court in her guilty plea or that De Nieto had lied to federal officials in her post-arrest interview.

Moreover, the government asserted that "[t]here [was] little doubt that TURRUBIATEZ NUNEZ would be a . . . witness against GARCIA DE NIETO at any trial or proceeding." Del Valle thus would have been required to cross-examine his former client testifying against his current client, violating his professional and ethical obligations. *Wheat*, 486 U.S. at 164; MODEL RULES OF PROF'L CONDUCT r. 1.7 cmt. 6 (AM. BAR ASS'N 2015). Thus, as the district court considered the government's motion to disqualify, it was readily apparent that an actual conflict of interest, or, at the very least, a serious potential conflict of interest could have arisen at trial.

The decision to disqualify del Valle was not an abuse of discretion even

---

[2] *See* Tex. Disciplinary Rules of Prof'l Conduct r. 1.05 (governing confidentiality of information); r. 1.06(b)(2) ("[A] lawyer shall not represent a person if the representation of that person . . . reasonably appears to be or become adversely limited by the lawyer's . . . responsibilities to another client or to a third person or by the lawyer's . . . own interests."); *id.* r. 1.06 cmt. 4 ("Loyalty to a client is impaired . . . in any situation when a lawyer may not be able to consider, recommend or carry out an appropriate course of action for one client because of the lawyer's own interests or responsibilities to others."); *id.* r. 1.09 (governing conflicts of interest between present and former clients); *id.* r. 1.09 cmts. 2–4.

considering a potential waiver of conflict by De Nieto. Del Valle's representation of De Nieto raised the specter of serious potential conflicts of interest, conflicts that could have resulted in the inadequate representation of De Nieto, breaches of professional responsibility and ethics, and the undermining of the court's integrity and soundness of its proceedings and eventual judgment that would have persisted despite waiver. Therefore, the district court was well within its "substantial latitude in refusing waivers of conflicts" when it disqualified del Valle. *See Wheat*, 486 U.S. at 163.

De Nieto urges that in every situation, a court must hold a hearing before granting a motion to disqualify counsel. She is incorrect. In *United States v. Ahmad*, No. 95-50075, 1995 WL 449667, at *7 (5th Cir. July 13, 1995),[3] this court affirmed the disqualification of an attorney without a hearing, finding "no abuse of discretion." Thus, the procedural fact that the district court did not hold a hearing before disqualifying del Valle is not fatal. Furthermore, a hearing was not necessary to uncover nuanced, hidden conflicts. The actual and potential conflicts involved in del Valle's representation of De Nieto were apparent from the record, the government's motion, and the record of Turrubiatez's case, which was before the same district judge.

Even assuming that it was an abuse of discretion not to hold a hearing before disqualifying del Valle, that purported error was harmless. On limited remand, the district court held a hearing to determine whether del Valle could represent De Nieto on appeal. The court found that del Valle could not, determining that he was "still disqualified from representing" De Nieto for the same reasons the government had identified in its original motion to disqualify. De Nieto does not contend that the disqualification ruling at that point was

---

[3] Unpublished decisions issued before 1996 are precedential. *See* 5TH CIR. R. 47.5.3.

erroneous. Thus, the record strongly suggests that a hearing would not have changed the decision. So any error was harmless and did not affect De Nieto's substantial rights.[4]

## VI.

De Nieto urges that "even if [this court] determine[s] that the errors . . ., standing alone, were insufficiently prejudicial to warrant reversal, [her] conviction should be reversed because taken together, the aggregate effect gives rise to substantial prejudice." "Cumulative error justifies reversal only when errors so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) (cleaned up). This court has "repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances." *Id.* Thus, "the possibility of cumulative error is often acknowledged but practically never found persuasive." *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc).

De Nieto has not established that the district court erred in any respect. Therefore, "the cumulative error doctrine has no applicability to [De Nieto's] allegations of error."[5] The judgment of sentence is AFFIRMED.

---

[4] *See* FED. R. CRIM. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

[5] *Delgado*, 672 F.3d at 344; *see also id.* ("Because we have rejected [defendant's] other allegations of error, and non-errors have no weight in a cumulative error analysis, there is nothing to accumulate.").