# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00302-COA

**SETH COPES A/K/A SETH THOMAS COPES**  **APPELLANT**
**A/K/A SETH T. COPES**

**v.**

**STATE OF MISSISSIPPI**  **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/30/2018 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/02/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., GREENLEE AND WESTBROOKS, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     Seth Copes was convicted in the Lowndes County Circuit Court of two counts of

sexual battery of two minors, Anna and Betty.[1]  He was sentenced to twenty years on each

count, to be served consecutively, in the custody of the Mississippi Department of

Corrections.

¶2.     On appeal, Copes claims (1) he was denied his right to his counsel of choice, (2) the

court erred by excluding evidence of counseling sessions that would have showed that

---

[1] We use pseudonyms to protect the victims' identities.

another witness, Cathy,[2] displayed a pattern of dishonesty, (3) the court erred by excluding evidence that would have showed that one victim, Anna, engaged in misconduct, and (4) the court erred by admitting incompetent opinion evidence from Mokesha Thompson, an employee of the Division of Family and Children Services. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3. Anna and Betty were born in 1998 and lived with their parents until they were approximately five years old. Then they, along with their older sister, moved in with their grandparents for approximately one and a half years. In 2006, their grandparents became unable to care for them, so they moved to the Palmer Home for Children in Columbus, Mississippi, and were placed in a residential cottage with house parents Seth Copes ("Seth") and Kara Copes ("Kara"). In 2013, Betty and Anna disclosed to their aunt, Michelle Flores, that they had been sexually abused by Seth years earlier. After an investigation, Seth was indicted for two counts of sexual battery. Testifying at trial was another former resident of the Palmer Home, Cathy.

¶4. Prior to trial, Seth, by and through his local counsel Patrick Rand, filed a motion for admission of counsel from Maryland pro hac vice. Seth requested that Thomas Pavlinic, an out-of-state attorney, be admitted for the purpose of participating as co-counsel. Also prior to trial, the State filed a motion to introduce evidence of Seth's sexual misconduct toward

---

[2] We use a pseudonym to protect this witness as well.

Cathy pursuant to Mississippi Rule of Evidence 404(b)[3] and a motion in limine to prevent the defense from soliciting testimony regarding the victims' sexual behavior or predisposition pursuant to Mississippi Rule of Evidence 412, commonly referred to as the "rape shield" rule.[4]

¶5.     During opening statements, Pavlinic told the jury that Anna and Betty had used someone else's electronic device to send inappropriate text messages, or "sexts." The State asked to approach the bench and asserted that the alleged text messages had not been produced in discovery. Pavlinic responded that the messages had been deleted, but he assumed that Anna and Betty would not lie about them. The court stated, "I've told you to be very careful, both sides, about this. And I've told you to approach when you have something that was probably going to be problematic. And what you're doing is, you're going around that in opening statements." Ultimately, the court held that Pavlinic could say that an internet rule of the Palmer Home had been violated but could not discuss the sexual nature of the violation because it was protected by the rape shield rule.

¶6.     At trial, evidence was presented that the Copes began working at the Palmer Home in February 2006. The Copes lived in a residential cottage with their daughters and several female residents. Three of the residents were Anna, Betty, and Cathy.

---

[3] Rule 404(b) provides, in relevant part, that evidence of a crime, wrong, or other act "may be admissible . . . [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

[4] "Pursuant to Rule 412(a), reputation or opinion evidence of a victim's past sexual behavior is inadmissible in criminal cases involving sexual offenses." *Williams v. State*, 240 So. 3d 436, 445 (¶25) (Miss. Ct. App. 2017).

¶7. Cathy testified that she was born in 1997 and that Seth touched her inappropriately sometime before 2009. According to Cathy, one night she woke up, and Seth was lying behind her in bed. She tried to move over, but he put his hands on her pelvic bone and pulled her back toward him. Another time, Seth picked her up while she was sleeping and put her on his bed while Kara was away. Then he got in the bed and put her hand on something, which she realized was his penis. When she moved to the edge of the bed, he pulled her back and touched her vagina with his hands and thrust against it with his penis.

¶8. Approximately one month after the inappropriate contact occurred, Cathy told the Copeses' nine-year-old daughter, Madison, and Madison told her to tell Kara. According to Cathy, Kara told her that it was "just a dream." Cathy initially agreed with Kara and said, "Okay." But Cathy testified, "I know for a fact [that] I was not dreaming."[5] According to Kara, she reported the incident to a Palmer Home counselor and completed an incident report on August 3, 2008, which stated, in part:

> [Cathy] told Madison that she had been having bad dreams about being touched inappropriately and thought that maybe it was Seth because he was the only man (in our all girls house)[.] Madison encouraged [Cathy] to tell. [Cathy] said that she has been having dreams about someone touching her vagina and it hurts. Her uncle is in her dream, but she can't see his face. . . .

According to Kara, she was told to continue taking Cathy to counseling, and the incident report indicated that Cathy would go to her appointment with Teressa Hubbard on August 5, 2008, as scheduled.

---

[5] Cathy testified about two more incidents that occurred after she told Kara. On one occasion, Seth tried to take her off the top bunk, but she would not move. Another time, she woke up in the living room, and he was standing in front of her and smiling at her. However, Cathy admitted that neither of these incidents involved inappropriate touching.

4

¶9.    Anna testified that Seth began sexually abusing her in approximately 2006. Anna described various incidents when Copes lay in her bed and used her hand to stroke his penis and testicles, pulled her pants down and felt underneath her panties, rubbed his penis against her vagina, and rubbed "jelly" on her vagina. She also testified that he once inserted his penis in her mouth, and on another occasion, he attempted to put his penis inside her vagina.

¶10.    According to Anna, she was "not the good child." The Copeses testified that she began breaking the rules in approximately 2010. They said that in 2012, she was removed from sports as a result of rule violations. According to Kara, things got worse after that. In 2013, while Anna was visiting her aunt, her aunt asked her who had sexually abused her as a child. According to Anna, her family had long suspected that she had been abused. Anna told her aunt to "drop it." Shortly thereafter, Anna received a phone call from Kara. According to Anna, Kara yelled at her for breaking Madison's iPod and took money out of her account to purchase another one. According to Kara, Betty and/or Anna had damaged Madison's iPod, and Kara had previously said that they would have to pay for it. Kara testified that she texted them to tell them that the debt had been paid, but Anna and Betty called her and screamed at her over the phone. Afterward, Seth called Anna and Betty and reprimanded them for talking disrespectfully to Kara and told them that their sports privileges were on the line for the next year. Anna testified that she thought, "[I]f you're so worried for your wife, why are you touching on kids?" After Anna hung up the phone, she disclosed to her aunt that Seth had sexually abused her. Betty confirmed the abuse to her aunt.

¶11.    Outside the presence of jury, Pavlinic told the court that he wanted to establish on

cross-examination why Anna was "the bad one." He proffered that in 2007 Anna had urinated in orange juice and told Madison to drink it. He also wanted to question Anna about sneaking out to meet boys, using an electronic device for inappropriate purposes, and violating other rules such as the dress code. However, the court ruled that the alleged juice incident had not been disclosed in discovery and was inadmissible. The court further ruled that Pavlinic could question Anna about sneaking out, but he could not question her about why she was sneaking out. And he could question her about breaking Madison's iPod but not about using an electronic device for inappropriate purposes. Basically, the court held that Pavlinic could question Anna about rule violations but not the sexual nature of the violations because it was an impermissible attack on her character. Finally, there was a discussion about discovery issues, and the court noted that Pavlinic "had not provided much of anything" during discovery. The court told local counsel, Rand, to explain reciprocal discovery to Pavlinic and stated that if Pavlinic could not agree with the rules in Mississippi "then [Rand] will have to take over this[,] and [Pavlinic] will assist."

¶12. Then Pavlinic reasserted that he wanted to question Anna about the alleged juice incident, sneaking out to meet boys, and sending inappropriate text messages to show that she was manipulative, malicious, and deceptive. Pavlinic wanted to show that Anna would do anything in order to leave the Palmer Home. The court reiterated that the juice incident, which allegedly occurred in 2007, was too remote from when Anna allegedly made false allegations against Seth to leave the Palmer Home. And the court reiterated that Pavlinic could question Anna about sneaking out and breaking Madison's iPod but not the sexual

6

nature of the rule violations.

¶13.   On cross-examination, Anna admitted that she had violated the curfew and testified that she had snuck out with a twenty year old when she was twelve years old. According to Anna, she told on herself and was still punished for it. Pavlinic asked, "[A]s a result of that occurrence, was there a suicide attempt in your life?" The State objected, and outside the presence of the jury, the court asked Pavlinic how his question was relevant. Pavlinic responded that it showed that Anna went to counseling but never made any allegations against Seth during her sessions. The court asked, "Couldn't you have [asked] [']didn't you go to . . . counseling['] without bringing up the suicide attempt?" Then the court asked, "Mr. Rand, are you about ready to try this case? Because I'm about to take this out of Mr. Pavlinic's hands. You better find me a case quickly . . . that tells me why that's relevant to anything." After a brief recess, the court stated, "I don't think that you [(Pavlinic)] need to participate any further, because I have lost faith that you are acting in good faith. . . . I've never had anybody do something that I considered to be so unethical." The court stated that it believed that Pavlinic's question was an intentional act to prejudice the jury against Anna.

¶14.   When Pavlinic suggested that Seth would be deprived of his counsel of choice if he was removed mid-trial, the court responded, "No. He's got a lawyer of his choice. He's got the one that he hired to begin with who is a member of the Mississippi Bar who has indicated that he would follow the [court's] rulings." The court held that Pavlinic could sit at the counsel table and advise, but Rand had to question the witnesses. The court reiterated, "[I]f there's something that you believe that needs to be addressed, . . . ask the [c]ourt before you

7

launch off into something."[6]

¶15.    After the court denied Pavlinic's request for a mistrial, Rand continued Anna's cross-examination. During cross-examination, Anna admitted that she never made any allegations against Seth during her counseling sessions. She also admitted that she had been upset that her sports privileges had been revoked in 2012. She admitted that she hated the Palmer Home. However, Anna testified that she did not fabricate the sexual-abuse allegations to leave the Palmer Home.

¶16.    Betty also testified that Seth had sexually abused her. According to Betty, on one occasion, Seth came into her bedroom, pulled down her pants, and moved his finger in between the lips of her vagina. On another occasion, she went to the bathroom and wiped a "white cream" off herself. Betty testified that she did not disclose the sexual abuse to anyone prior to 2013 because "the good just outweighed the bad," and she did not want to ruin her relationship with Seth.

¶17.    Meg Blaylock, a counselor at the Palmer Home, testified that Anna and Betty's grandmother informed her of the sexual-abuse allegations. Ultimately, Drake Bassett, the president and CEO of the Palmer Home, was notified, and the allegations were reported to law enforcement as well as the Department of Human Services.[7]

¶18.    Mokesha Thompson with the Division of Family and Children Services testified that

_____

[6] The court also suggested that Rand should be lead counsel because he was a member of the Mississippi Bar and was licensed to practice law in Mississippi.

[7] Blaylock and Bassett began working at the Palmer Home after Cathy had made her allegations against Seth.

she received a report from the Palmer Home regarding the allegations against Seth and interviewed Anna and Betty the next day. According to Thompson, she stopped the interview and scheduled forensic interviews when they stated that they had been touched inappropriately. Thompson testified that she observed Anna's and Betty's forensic interviews, and they disclosed that they were sexually abused by Seth. According to Thompson, their disclosures were consistent with the disclosures in their initial interviews. Defense counsel objected on the basis of "characterization, consistency of the statements; I think that's a conclusion issue." The court overruled the objection.

¶19. During the defense's case, there was a discussion outside the presence of the jury about the admissibility of counseling records from Cathy's sessions with Teressa Hubbard, a clinical social worker. The court noted that it was concerned about the time being spent on Cathy when Seth had not been indicted for sexual battery against Cathy. Specifically, the court stated, "We're spending an awful lot of time on [Cathy,] and she is not the victim in this cause number." The court stated that it "did not anticipate that there would be this much time spent on [Cathy] in this case. The [c]ourt has some concern based upon that very issue." The court also noted that Cathy had not waived her medical privilege.

¶20. Ultimately, the court ruled that Hubbard could be questioned about her progress notes from August 5, 2008, but anything before or after "has not [been] ruled on [as to] privilege." In the presence of the jury, Hubbard testified that her notes from August 5, 2008, indicated that Cathy discussed having dreams about past sexual abuse by her uncle. On cross-examination, Hubbard testified that the incident report from August 3, 2008, was attached

9

to the notes in her file. According to Hubbard, someone must have given it to her. She also suggested that it would not have been unusual for her and Kara to have a discussion prior to Cathy's sessions about the reasons for therapy.

¶21. Kara had testified that there had possibly been times when Seth was left alone with the girls, but Seth denied touching them. Seth testified suggesting that the girls made the allegations because they disliked having consequences for their actions. However, he said that the girls liked him, not Kara. Yet he acknowledged that there were no allegations against Kara.

¶22. After considering the evidence, the jury convicted Seth of Count I, sexual battery against Anna, and Count II, sexual battery against Betty. On appeal, Seth claims (1) he was denied his right to his counsel of choice; (2) the court erred by limiting evidence of Cathy's counseling sessions to August 5, 2008, and excluding evidence of other sessions; (3) the court erred by excluding evidence of Anna's alleged misconduct; and (4) the court erred by admitting incompetent opinion evidence from Thompson.

## DISCUSSION

### I. Whether Seth was denied the right to his counsel of choice.

¶23. Seth claims he was denied his right to his counsel of choice by the court's removal of Pavlinic mid-trial. The court's issues with Pavlinic started at the beginning of trial. During opening statements, Pavlinic told the jury that Anna and Betty used someone else's electronic device to send inappropriate text messages, or "sexts." The alleged text messages had not been produced in discovery, and the court indicated that Pavlinic was attempting to

10

circumvent a prior ruling. Further, the court asked the attorneys to alert the court if there would be anything problematic.

¶24. Then during cross-examination, Pavlinic informed the court that he wanted to establish why Anna was "the bad one." He proffered that Anna had urinated in orange juice and told Madison to drink it. He also wanted to question Anna about sneaking out to meet boys, using an electronic device for inappropriate purposes, and violating other rules such as the dress code. However, the court ruled that the alleged juice incident was inadmissible due to the passage of time. Also, while Pavlinic could ask about certain rule violations, he could not question Anna about the sexual nature of the violations because it was an impermissible attack on her character. There was also an on-the-record discussion about reciprocal-discovery issues, and the court noted that Pavlinic "had not provided much of anything" in discovery.

¶25. Then Pavlinic reasserted that he wanted to question Anna about the alleged juice incident, sneaking out to meet boys, and sending inappropriate text messages to show that she was manipulative, malicious, and deceptive. The court reiterated that the juice incident, which allegedly occurred in 2007, was irrelevant. And the court again explained that Pavlinic could not question Anna about the sexual nature of the rule violations.

¶26. When Pavlinic continued with Anna's cross-examination, she admitted that she had violated her curfew and testified that she had snuck out with a twenty year old when she was twelve years old. According to Anna, she told on herself but still received punishment. Pavlinic asked, "[A]s a result of that occurrence, was there a suicide attempt in your life?"

11

The court asked Pavlinic how his question was relevant. Ultimately, the court stated, "I don't think that you [(Pavlinic)] need to participate any further, because I have lost faith that you are acting in good faith. . . . I've never had anybody do something that I considered to be so unethical." The court stated it believed that Pavlinic's question was an intentional act to prejudice the jury against Anna. The court stated that Pavlinic was admitted pro hac vice with the understanding that he would follow the rules. Ultimately, the court held that Pavlinic could sit at the counsel table and advise, but Rand had to question the witnesses.

¶27. "In all criminal prosecutions, the accused shall enjoy the right . . . to have Assistance of Counsel for his defence." U.S. Const. Amend. VI; *accord* Miss. Const. art. 3, § 26 ("In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both . . . ."). "Assistance of counsel includes the right to select an attorney of one's choosing." *United States v. Jackson*, 805 F.3d 200, 202 (5th Cir. 2015) (citing *United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007)). "This right, however, is not absolute." *Id*. (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)).

¶28. Mississippi Rule of Appellate Procedure 46(b) governs the admission of foreign attorneys pro hac vice. Whether foreign attorneys will be admitted is subject to the attorney meeting the requirements of Rule 46(b). This rule provides, in part, that the foreign attorney must be "of good moral character and familiar with the ethics, principles, practices, customs, and usages of the legal profession in this state . . . ." M.R.A.P. 46(b)(2). The trial court became concerned that Pavlinic had violated the rules of discovery, had attempted to circumvent the court's prior ruling during opening statements, and had repeatedly challenged

12

the court's rulings. The court continually admonished counsel to alert the court to problematic questions before asking them. Thereafter, Pavlinic asked Anna about a suicide attempt. Although not sexual in nature, the court viewed the question as an intentional act to prejudice the jury against the victim, Anna.

¶29. The State argues that "[a] trial judge has an obligation to prevent improprieties during the trial, and may rebuke counsel for improper conduct." *Chase v. United States*, 656 A.2d 1151, 1155 (D.C. 1995). This Court has held that "a trial judge has a duty to control the courtroom by using 'reasonable measures to efficiently move matters along and keep over-zealous counsel in check.'" *Walden v. State*, 29 So. 3d 17, 22 (¶17) (Miss. Ct. App. 2008) (quoting *In re Blake*, 912 So. 2d 907, 914 (¶16) (Miss. 2005)). Furthermore, courts have inherent power to maintain control over the proceedings before them. *Knott v. State*, 731 So. 2d 573, 576 (¶11) (Miss. 1999); *see also Aeroglide Corp. v. Whitehead*, 433 So. 2d 952, 953 (Miss. 1983) ("[A]ll courts possess the inherent authority to control the proceedings before them including the conduct of the participants."). In this case, the court had to reiterate prior rulings repeatedly and could not ensure that Pavlinic would not run afoul of important evidentiary rules. The court noted that Pavlinic was admitted with the understanding that he would follow the rules and had not acted in good faith.

¶30. The dissent asserts that this case is controlled by the United States Supreme Court's decision in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). In *Gonzalez-Lopez*, counsel's provisional entry of appearance was revoked prior to trial after he violated a court rule restricting cross-examination of a witness to one counsel. *Id*. at 142. Subsequently, the

court denied the attorney's applications for admission pro hac vice, reasoning that he had violated the rule against communications with a represented party. *Id*. at 142-43. In the instant case, Pavlinic was prohibited from further questioning witnesses after the court had become concerned that he had violated the rules of discovery, attempted to circumvent the court's prior ruling during opening statements, and had repeatedly challenged the court's rulings during trial. While counsel in *Gonzalez-Lopez* was removed from the case and ordered to have no contact with Gonzalez-Lopez's newly retained counsel, Pavlinic was permitted to sit at counsel table and assist co-counsel during the remainder of Copes's trial. *Id*. at 143.[8] Furthermore, Gonzalez-Lopez "was unable to meet with [his desired counsel] throughout the trial, except for once on the last night." *Id*. Nothing prohibited Seth from meeting with Pavlinic. For these reasons, this issue is without merit.

## II. Whether the court erred by limiting evidence of Cathy's counseling sessions to August 5, 2008, and excluding evidence of other sessions.

¶31. Seth claims that the court erred by limiting the evidence from Cathy's counseling sessions to what occurred during her counseling session on August 5, 2008, and excluding evidence of other sessions. He argues that progress notes from additional sessions with Hubbard should have been admitted to show that Cathy displayed a pattern of dishonesty. The exclusion of evidence is reviewed for an abuse of discretion. *Lowe v. State*, 269 So. 3d 244, 256 (¶39) (Miss. Ct. App. 2018). "This Court shall not disturb a trial court's decision unless it is clearly wrong." *Id.* (quoting *Terrell v. State*, 952 So. 2d 998, 1005 (¶31) (Miss.

---

[8] To enforce the court's order, a United States Marshal sat between the two attorneys at Gonzalez-Lopez's trial. *Id*.

Ct. App. 2006)).

¶32. During trial, defense counsel asked if he would be able to question Hubbard about Cathy's visit on August 5, 2008, which occurred shortly after she disclosed the sexual abuse to Kara. Defense counsel asked, "Your Honor, it's my understanding that I will be only allowed to inquire as to the date of the visit?" The court responded, "That was the [c]ourt's ruling, not the content . . . of what apparently [Cathy] told Ms. Hubbard that day . . . ."

¶33. Then the State indicated that it wanted to use Hubbard's testimony to show that Kara was not a credible witness and that she covered up Seth's abuse by telling Cathy that she had been dreaming. It was also seemingly suggested that Hubbard's progress notes had been influenced by the incident report that Kara completed following Cathy's allegations. Several times, the court stated that it was concerned about the amount of time being spent on Cathy because she was not a victim named in the indictment. Outside the presence of the jury, the court questioned Hubbard about her progress notes from August 5, 2008, and how she came into possession of the incident report. Ultimately, the court ruled that Hubbard could be questioned about her progress notes from August 5, 2008, and the incident report. However, the court noted that contents of notes dated prior to or after August 5, 2008, had not been ruled on as to whether they were covered by the medical privilege.

¶34. Now Seth claims that the court erred by excluding progress notes from other counseling sessions. Seth cites to various progress notes contained in Sealed Exhibit 3, and he suggests they show that Cathy was dishonest. The State contends on appeal that Seth did not preserve this issue at trial. In response, Seth argues that the issue was preserved because

15

"Hubbard's testimony was proffered and the contents of Sealed Exhibit 3 are a part of the appellate record." However, Seth does not cite to any portion of the record that shows that he asked the court to admit additional records to show that Cathy was dishonest. Generally, this Court "will not address issues raised for the first time on appeal." *Matheny v. State*, 289 So. 3d 328, 333 (¶10) (Miss. Ct. App. 2020) (citing *Young v. State*, 270 So. 3d 175 (¶3) (Miss. Ct. App. 2018)). Accordingly, this issue was waived.

¶35. Furthermore, we note that the court was concerned about "wast[ing] time" and the amount of time spent on Cathy when she was not a victim named in the indictment. Under Mississippi Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Even if Seth had preserved the issue, the court would have had discretion to exclude the evidence if its probative value was substantially outweighed by a danger of confusing the issues, misleading the jury, or wasting time.

III. **Whether the court erred by excluding evidence of Anna's misconduct.**

¶36. Seth claims the court erred by limiting evidence of Anna's misconduct. At trial, defense counsel wanted to question Anna about why she was regarded as "the bad one." Specifically, defense counsel wanted to question Anna about allegedly urinating in someone's orange juice, sneaking out to meet boys, and sending inappropriate text messages.

¶37. On appeal, Seth claims that evidence of the alleged juice incident and inappropriate messages should have been admitted to show that Anna was manipulative and dishonest.

16

Specifically, Seth argues that "[t]he inference sought to be established would be that [Anna] manipulated her sister [Betty] and the events of the accusations against [Seth] all for the purpose of getting removed from Palmer Home so she could go live with her aunt . . . ." Seth further argues that "[a]nother inference supported by the excluded evidence was that Anna and Betty's accusations against [him] were in retaliation for the broken iPod punishment among other things."

¶38. This Court has held that "[e]vidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Ellis v. State*, 196 So. 3d 1029, 1038 (¶31) (Miss. Ct. App. 2015) (quoting M.R.E. 401). "Irrelevant evidence is not admissible." M.R.E. 402. Here, evidence of the alleged juice incident and inappropriate text messages were irrelevant because neither incident tended to prove that Anna manipulated Betty into fabricating allegations about Seth. Nor does it show that they fabricated allegations in retaliation for being punished.[9]

¶39. Although the court held that Anna could not be questioned about the sexual nature of the rule violations, the jury still heard why Anna was regarded "the bad one." Anna admitted to violating rules, and she admitted that she hated the Palmer Home. The rape shield rule "is designed to prevent the introduction of irrelevant evidence of the victim's past sexual behavior to confuse and inflame the jury into trying the victim rather than the defendant."

---

[9] We note that the alleged juice incident occurred in 2007, which was six years before Anna and Betty disclosed the sexual abuse. We also note that according to defense counsel at trial, Anna "enticed [*Cathy*] to take a picture of her breast and send it," not Betty.

17

*Cage v. State*, 149 So. 3d 1038, 1045 (¶18) (Miss. 2014) (quoting *Hughes v. State*, 735 So. 2d 238, 273 (¶153) (Miss. 1999)). Because the court did not abuse its discretion by excluding the evidence, this issue is without merit.

**IV.     Whether the court erred by admitting allegedly incompetent opinion evidence from Thompson.**

¶40.    Finally, Seth claims the trial court erred by allowing Thompson to improperly vouch for Anna's and Betty's credibility. Thompson (of the Division of Family and Children Services) testified that she interviewed Anna and Betty but stopped the interviews and scheduled forensic interviews when they said they had been touched inappropriately. Thompson testified that she observed the forensic interviews and that in the interviews they disclosed sexual abuse by Seth. According to Thompson, their disclosures were consistent with what they told her during their initial interviews.

¶41.    In support of his argument, Seth cites to *Griffith v. State*, 584 So. 2d 383 (Miss. 1991), for the proposition that "[a] direct opinion offered by a witness in a child sexual abuse case as to the child's veracity has been held by a majority of the courts to be inadmissible." *Id*. at 386-87. In *Griffith*, a witness was allowed to testify at trial that "in her opinion, [the victim] had told her the truth because [she] 'could not have told this story twice and almost word for word if she had not experienced it. That is the reason why I truly believe her.'" *Id*. Our supreme court reversed the conviction because the statements made by the victim were hearsay. *Id*. at 384. The court further cautioned against allowing direct comments as to the victim's veracity on remand. *Id*. at 387. This case is distinguishable from *Griffith*. Thompson testified that Anna's and Betty's statements during their forensic interviews were

18

*consistent* with what they told her in their initial interviews. She did not testify as to her opinion of Anna's or Betty's credibility or the veracity of their statements.[10] Accordingly, this issue is without merit. There being no error, we affirm.

¶42. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD, J. SMITH, J., NOT PARTICIPATING.**

**McCARTY, J., DISSENTING**:

¶43. Because the United States Supreme Court has explicitly banned exactly what the trial court did here—depriving a criminal defendant the choice of counsel—the only option we have is to reverse.

¶44. The Sixth Amendment to the federal Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Our Mississippi right is more explicitly protective: "In all criminal prosecutions the accused *shall* have a right to be heard by himself or counsel, or both[.]" Miss. Const. art. 3, § 26 (emphasis added).

---

[10] Seth also cites to *Goodson v. State*, 566 So. 2d 1142 (Miss. 1990) (negative history omitted), and *Rose v. State*, 556 So. 2d 728, 732-33 (Miss. 1990). In *Goodson*, a doctor was allowed to testify at trial that she was of the opinion that the victim was telling the truth. *Goodson*, 566 So. 2d. at 1153. Our supreme court reversed and cautioned against such testimony on remand. *Id*. at 1153-54. In *Rose*, our supreme court held that the testimony of a sheriff was inadmissible because he "in essence, told the jury that they were to believe the stories of the three co-defendants, despite discrepancies among their accounts . . . ." *Rose*, 556 So. 2d at 733. For the same reason as stated above, these cases are distinguishable.

19

¶45.    The United States Supreme Court has interpreted the Sixth Amendment to include not just the right to counsel, but the *choice* of counsel as well when such counsel is not retained and not appointed.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) ("We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him") (collecting cases).  Although there are some limitations, "'the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.'"  *Id*. (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989)).

¶46.    This case is controlled fully by the federal Court's decision in *Gonzalez-Lopez*, which considered "whether a trial court's erroneous deprivation of a criminal defendant's choice of counsel entitles him to a reversal of his conviction." *Id.* at 142.  The defendant was on trial for conspiracy to distribute a large amount of marijuana and, like Seth here, had a local attorney and added an attorney from out of state.  *Id*.  During an evidentiary hearing, a magistrate judge yanked the provisional acceptance of the out-of-state lawyer "on the ground that, by passing notes to [local counsel], [he] had violated a court rule restricting the cross-examination of a witness to one counsel." *Id.*

¶47.    After a frankly bizarre series of complications, the defendant went to trial, all while requesting that the out-of-state lawyer represent him, which the magistrate judge and district court had prohibited due to alleged violations of the Missouri Rules of Professional Conduct. *Id*. at 142-43.  The district court found that because he was removed from representation of

the client but still continued to talk with him, the out-of-state counsel violated the rule on contacting a client without permission of the client's lawyer. *Id*. The Supreme Court granted review to examine whether the defendant's Sixth Amendment right to his counsel of choice was violated and whether harmless-error review could apply. *Id*. at 144.

¶48. Justice Scalia, writing for the majority, was succinct. The Sixth Amendment "commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best." *Id*. at 146. "In sum, the right at stake here is the right to counsel of choice, not the right to a fair trial; and that right was violated because the deprivation of counsel was erroneous." *Id*.

¶49. Critically, the Sixth Amendment right could be violated even if defendants did not show how it harmed them. *Id*. The Court ruled that "[n]o additional showing of prejudice is required to make the violation 'complete.'" *Id*.

¶50. Important to the case at hand, a distinction was made between the right to choose a lawyer and the right to have a competent lawyer. *Id*. at 148. Courts should be careful not "to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed." *Id*.

¶51. The Supreme Court further concluded that an erroneous deprivation of the right to chosen counsel was not subject to harmless-error analysis. *Id*. at 150. "Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in

21

an alternate universe." *Id.*[11]

¶52.    Against this background we see immediately how the disqualification of the defendant's lawyer bursts through the restraints of the Sixth Amendment.  It is clear that the out-of-state lawyer was "the counsel [Seth] believe[d] to be best," and as such, it was error for the trial court to strip his assistance from the defendant.  It would have been error had the trial court violated Seth's Sixth Amendment right pretrial, as happened in *Gonzalez-Lopez*; the error is magnified further because the trial court did it *during* the criminal trial.  *See also People v. Johnson*, 547 N.W.2d 65, 68 (Mich. Ct. App. 1996) ("A trial court may not remove a defendant's counsel merely over a disagreement regarding the conduct of defense counsel.").

¶53.    And there was nothing the lawyer did that warranted disqualification.[12]  The lawyer was not even straining against Mississippi Rule of Evidence 412, the red herring in this case,

---

[11] The Court concluded it would be impossible to ascertain how the trial could have gone because there is a difference "in matters ranging from questions asked on voir dire and cross-examination to such intangibles as argument style and relationship with the prosecutors."  *Gonzalez-Lopez*, 548 U.S. at 151.  "We would have to speculate upon what matters the rejected counsel would have handled differently," the Court concluded, or "would have handled the same but with the benefit of a more jury-pleasing courtroom style or a longstanding relationship of trust with the prosecutors."  *Id*.

[12] For violating the order of a court or disrupting a proceeding, a lawyer can be sanctioned or held in contempt, and a trial court could even grant a mistrial.  For "[a]ttorneys are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury."  *Minka v. State*, 234 So. 3d 353, 362 (¶39) (Miss. 2017) (internal quotation marks omitted).  During a criminal trial, the defense counsel had made a "declaration to the jury during opening statements that the prosecution had betrayed its trust," and the Supreme Court found that such comments "falls in that category" of banned behavior.  *Id*.  In so doing, it upheld a sanction of direct criminal contempt and monetary sanctions.  *Id*.  What the out-of-state lawyer did in this case is a few miles down the road from what happened in *Minka*.

because asking if the witness had attempted to commit suicide *has nothing to do* with the victim's sexual behavior or predisposition. It is a basic inquiry into the witness' credibility, which is a classic example of cross-examination.

¶54. Indeed, the very definition of cross-examination makes clear that the mode of questioning *at least includes* inquiry into bias. Our Rules of Evidence provide that "[c]ross-examination shall not be limited to the subject matter of the direct examination and matters affecting the credibility of the witness," which in turn allows a wide-open cross-examination. MRE 611(b).

¶55. Furthermore, "[t]he right to confrontation and cross-examination extends to and includes the right to fully cross examine the witness on every material point relating to the issue to be determined *that would have bearing on the credibility of the witness* and the weight and worth of his testimony." *Jackson v. State*, 924 So. 2d 531, 539-40 (¶24) (Miss. Ct. App. 2005) (emphasis added). Impeachment is one important function of cross-examination, and accordingly "[w]ide latitude is permitted in cross-examination to show bias or motive and the [e]ffect on a witness's credibility." *Bennett v. State*, 933 So. 2d 930, 947 (¶62) (Miss. 2006).

¶56. As the Encyclopedia of Mississippi Law sets out, "[o]ne powerful tool of cross-examination is Rule 616's grant of power to question a witness about bias." David Neil McCarty, *Evidence*, 4 MS Prac. Encyclopedia MS Law § 33:65, Bias of Witnesses (Jeffrey Jackson, Mary Miller & Donald Campbell eds., 2d ed. 2016). The Rule itself is clear: "For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest

of the witness for or against any party to the case is admissible." MRE 616.

¶57.　Accordingly, "[p]arties may liberally cross-examine proffered witnesses regarding bias and interest." *Johnson v. State*, 756 So. 2d 4, 7 (¶8) (Miss. Ct. App. 1999). "Not only is this right secured by our rules of evidence," but "it is a function of the confrontation clauses of federal and state constitutions." *Anthony v. State*, 108 So. 3d 394, 397 (¶6) (Miss. 2013).

¶58.　In accord with that fundamental understanding of the value of impeaching the witness in this case, the trial court should not have halted the lawyer's inquiry. Regardless of whether the trial court thought it was distasteful, this is a legitimate defense and a valid avenue of inquiry for a zealous lawyer. It is a root principle of our legal system that "[a]ll clients are entitled to lawyers who will be diligent, competent, and zealous." *Nail v. Wright*, 302 So. 3d 1268, 1276 (¶49) (Miss. Ct. App. 2020). The lawyer here was hotly pursuing whether the witness was credible, which is one of the most basic functions of zealous advocacy. Not only then did disqualifying the out-of-state lawyer violate the defendant's constitutional rights, it violated his right to confront a witness on a legitimate avenue of inquiry.

¶59.　There is little else to say. The trial court took away a lawyer from a defendant during a criminal trial. This error can never be harmless and must never be approved.

　　　　**McDONALD, J., JOINS THIS OPINION IN PART.**